UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| ARP WAVE, LLC, a Minnesota Limited Liability Company, | Case No. 18-CV-2046 (PJS/ECW) |
| Plaintiff/Counter-defendant, | |
| v. | ORDER |
| GARRETT M. SALPETER; NEUROLOGICAL FITNESS AND RECOVERY FACILITIES, LLC, a Texas Limited Liability Company; ARPWAVE AUSTIN, LLC, a Texas Limited Liability Company; NEUROLOGICAL FITNESS EQUIPMENT AND EDUCATION, LLC, a Texas Limited Liability Company; and JOHN DOES I-X, | |
| Defendants/Counter-claimants. | |

---

Boris Parker, Nicholas M. Wenner, and Jordan W. Anderson, PARKER & WENNER, P.A.; Jeffrey D. Shewchuk, SHEWCHUK IP SERVICES, LLC, for plaintiff.

Kevin Terrazas, CLEVELAND TERRAZAS PLLC; John M. Weyrauch and Peter R. Forrest, DICKE, BILLIG & CZAJA, PLLC, for defendants.

Plaintiff ARP Wave, LLC ("ARPwave") leased electro-stimulation devices to defendant Garrett Salpeter. ARPwave also licensed Salpeter to operate his own ARPwave clinic in Austin, Texas (defendant ARPwave Austin, LLC). After a few years of leasing devices and licensing rights from ARPwave, Salpeter decided to set up his own clinic and compete with ARPwave. Salpeter stopped conducting business as

"ARPwave Austin" and began conducting business through two new LLCs (defendants Neurological Fitness and Recovery Facilities, LLC and Neurological Fitness Equipment and Education, LLC).  He also stopped leasing ARPwave's electro-stimulation devices and instead started using (and selling and leasing to others) an electro-stimulation device that he had designed.

ARPwave brought this lawsuit against Salpeter and the other defendants (collectively "Salpeter") alleging a host of illegalities.  The Court previously dismissed three patent-infringement claims as improperly venued.  Now before the Court are cross-motions for summary judgment on the remaining claims—claims that allege breaches of various contracts, misappropriation of various trade secrets, various forms of unfair competition, various acts of conversion, and unjust enrichment.  Salpeter also brings a counterclaim alleging fraud.  For the reasons that follow, the Court grants in part and denies in part Salpeter's motion for summary judgment and denies ARPwave's cross-motion for summary judgment.

## I.  BACKGROUND

ARPwave and Salpeter are competitors.  Both provide electro-therapy to athletes and others wishing to recover from injury or reduce chronic pain.  *See, e.g.*, Pl.'s Ex. E at 136–38; ECF No. 18 at 5; Defs.' Ex. D.  Electro-therapy involves using electro-stimulation devices to send electrical currents through an individual's body.  *See* ECF

No. 1-9; Defs.' Ex. D.  Both parties provide direct treatment to individuals and also lease

electro-stimulation devices to individuals and train them on how to use those devices to

treat themselves or others.  *See, e.g*, ECF No. 250 ¶¶ 2, 3, 5; ECF No. 203-2 at 4.[1]  The

parties have adopted specific treatment protocols, which seek to ensure that the electro-

stimulation devices are used properly and produce the best possible results.  *See, e.g.*,

Pl.'s Ex. F at 27–30, 132–33, 343; Pl.'s Ex. E at 272; ECF No. 203-2 at 4, 7–11.

The parties' relationship started in 2006, while Salpeter was playing college

hockey.  Pl.'s Ex. G at 84–85.  Salpeter leased an ARPwave device known as the

"Trainer" and used the device throughout his remaining college-hockey career to train,

recover, and rehabilitate.  Pl.'s Ex. I at 63–64; Pl.'s Ex. B.  Salpeter was impressed by the

technology and, after graduating from college in 2008, he executed a contract with

ARPwave to lease four more Trainers.  ECF No. 18 at 5; Pl.'s Ex. G at 292; ECF No. 1-1.

The contract also granted Salpeter a license to use ARPwave's treatment protocols and

to open his own "ARPwave clinic"—i.e, a clinic at which he could use ARPwave

devices and ARPwave protocols to treat others.  *See* ECF No. 1-1.  The agreement had a

one-year term and required Salpeter to pay $68,250 for the Trainers and $16,800 for the

associated protocols and licensing rights.  *Id.* at 2, ¶¶ 1–2.

---

[1]The Court cites to this document's CM/ECF pagination.

Salpeter began operating his ARPwave clinic in Austin in 2009. ECF No. 203-2 at 3. Salpeter completed his payment obligations under the lease in September 2010. *See* Pl.'s Ex. J. At that point, Salpeter did not return the leased Trainers, nor did he make any further payments to ARPwave for them. (Salpeter also made no further payments for the licensing rights that he had been granted.) Nonetheless, ARPwave did not ask Salpeter to return its Trainers or to stop operating his ARPwave clinic. ECF No. 250 ¶ 9. This was apparently because the relationship between ARPwave and Salpeter continued to be financially beneficial to ARPwave. *Id.*[2]

During the course of operating ARPwave Austin, Salpeter executed additional leases with ARPwave for additional electro-stimulation devices. These leases included a five-year lease for an "RX 100" device (which the parties executed in 2010) and a five-year lease for a "POV Sport" device (which the parties executed in 2012). *See* ECF Nos. 1-2, 1-3. In addition to the lease payments that Salpeter made on the RX 100 and POV Sport, Salpeter had to "purchase time" to be able to use them. ECF No. 250 ¶ 8; Pl.'s Ex. E at 367. In other words, neither the RX 100 or the POV Sport could be

---

[2]It appears that ARPwave's owner (Denis Thompson) believed that the 2008 lease was for five years. ARPwave concedes that Thompson was mistaken and that the lease was for only one year. ECF No. 277 at 90; ECF No. 250 ¶ 7.

operated without paying usage fees, and those usage fees directly corresponded to the amount of time that the devices were used. "Salpeter acquired over 4,500 hours of time [on the two] devices, which signaled to [ARPwave] that he was treating and training a high number of patients and succeeding in his ARPwave clinic." ECF No. 250 ¶ 8. Salpeter also purchased various supplies from ARPwave and referred customers to the company. *Id.* ¶ 9.[3]

Much of what happened between 2008 and 2018 is contested, but, at some point, Salpeter decided to strike out on his own (without informing ARPwave of his plans). In 2015, Salpeter began to design an electro-stimulation device to compete with ARPwave's RX 100. *See, e.g.*, Pl.'s Exs. K, V; ECF No. 277 at 15. A prototype of the device was completed sometime in 2016 (by a company called Nanohmics). Pl.'s Ex. H at 67. Salpeter then engaged a different company (Johari) to start production of the device. *Id.* at 107–08. Salpeter claims that he designed his electro-stimulation device—which he calls "the Neubie"—based solely on an expired patent and other public information, *id.* at 73, 75, but the evidence in the record would allow a jury to

---

[3]Salpeter argues that he never agreed to the licensing portions of some of the contracts. ECF No. 231 at 5; ECF No. 260 at 3. None of the issues before the Court turn on whether Salpeter is correct, and thus the Court does not address his contention.

find that Salpeter actually reverse engineered ARPwave's devices to produce the Neubie.  Pl.'s Exs. V, W[4], Y[5], Z.

As Salpeter was working on the Neubie, he started forming new LLCs through which he could compete with ARPwave (Neurological Fitness and Recovery Facilities, LLC and Neurological Fitness Equipment and Education, LLC).  Pl.'s Ex. H at 145–46. Sometime in 2016, Salpeter changed the name of his electro-therapy clinic from "ARPwave Austin" to "NeuFit."  *Id.* at 149.  He continued to provide the same sort of electro-therapy treatment to clients.  *Id.* at 147–48.

ARPwave eventually got wind of Salpeter's activities.  Apparently around 2017 or 2018, ARPwave learned that Salpeter was no longer operating as "ARPwave Austin," but was instead operating as "NeuFit" and selling and leasing the Neubie.  *See* ECF

---

[4]Salpeter makes a hearsay objection to this document.  ECF No. 260 at 15.  The Court finds, however, that the document is admissible as the statement of an opposing party under Fed. R. Evid. 801(d)(2)(B).  *See United States v. Safavian*, 435 F. Supp. 2d 36, 43 (D.D.C. 2006) ("The context and content of certain e-mails demonstrate clearly that Mr. Safavian 'manifested an adoption or belief' in the truth of the statements of other people as he forwarded their e-mails.  They therefore are admissible as adoptive admissions under Rule 801(d)(2)(B)." (internal citations omitted)).

[5]Salpeter objects to this document on hearsay grounds.  ECF No. 260 at 16. Apparently because of issues with discovery, the relevant witnesses were not asked to provide a foundation for this document.  ECF No. 277 at 19–20.  It appears likely that this document will be admitted at trial, but it does not matter, as ARPwave has created a factual dispute even without this document.

No. 250 ¶ 11; Pl.'s Ex. E at 388.  At some point ARPwave also learned that Salpeter was trying to poach its clients.  *See* Pl.'s Ex. E at 137–38.  In June 2018, ARPwave—for the first time—demanded that Salpeter return all of his ARPwave devices, but Salpeter had already sold or otherwise gotten rid of those devices.  Pl.'s Exs. Q, R, T; Pl.'s Ex. G at 268–72.  This lawsuit followed.  This matter is now before the Court on the parties' cross-motions for summary judgment.

## II.  ANALYSIS

This case is a mess.  The problems started with the complaint.  From the beginning, ARPwave's lawyers have opted for quantity over quality, spending more effort generating claims than focusing on and developing evidence to support their best claims.  Not surprisingly, ARPwave's lawyers took the kitchen-sink approach in drafting their complaint, ignoring the criticisms of that approach that have repeatedly been made by the judges of this District.  *See Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011) ("This Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant.").

ARPwave accuses Salpeter of infringing three patents, misappropriating numerous trade secrets, breaching three contracts in numerous ways, engaging in

numerous acts of conversion, interfering with ARPwave's contractual and business relationships in numerous ways, and (of course) being unjustly enriched.  ECF No. 1. The Court previously dismissed the patent claims as improperly venued, *see ARP Wave, LLC v. Salpeter*, 364 F. Supp. 3d 990 (D. Minn. 2019), and Salpeter later added a counterclaim alleging fraud, *see* ECF No. 138 at 24–25.

A bad situation was then made worse by unprofessional behavior by the attorneys for both sides during discovery and pretrial proceedings.  Among the many lowlights of this case have been the lawyers bickering like children during depositions,[6] one lawyer questioning the sanity of another and mocking his intelligence,[7] and one lawyer asking the other if he wanted "step out of the room" and "have a fight."[8]  Both

---

[6]*See, e.g.*, Pl.'s Ex. G at 48–49; Pl.'s Ex. E at 376.

[7]*See* Pl.'s Ex. E at 166, 262.

[8]*See* Pl.'s Ex. E at 165.  The following exchange at a deposition gives a sense of the rancorous nature of this case:

> [MR. TERRAZAS:]  Sir, you are stating things on the record.  You are not answering my questions, and I need you to answer my questions. . . .

> MR. PARKER:  We would respectfully disagree that your questions are not being answered, counsel.  In fact, we would—

(continued...)

-8-

---

[8](...continued)

MR. TERRAZAS:  Boris, I know.  I know you do.

MR. PARKER:  —respectfully indicate on the record, counsel, that your questions, which are restated multiple times are being . . . answered over and over again.  And that's why I'm entering the objection of asked and answered.

MR. TERRAZAS:  Again, do you want to put some money on that, Boris?  Do you want to put money on all the questions that I've said nonresponsive to, to see whether or not he's answering?  Because I'm willing to do that.  Let's put our money where our mouth is.  If you truly believe what you're saying and you're not playing games like I think you are, let's do that.  And let's go through.  We'll get a transcript, and for every time, we'll put some money on, and you'll have to pay every time he is not answering the specific question that's asked.  Do you want to do that?

MR. PARKER:  Counsel, get the transcript.  Do whatever you need to do.  I have no idea what you're asking me now and what you want to engage in.  Are we gambling now in a deposition?  Are you done with calling me names?  Now you want to gamble?

MR. TERRAZAS:  I'm not calling you names, Boris.

MR. PARKER:  Is there something else?  Should we—should we have a fight, counsel?

MR. TERRAZAS:  I'm not—I'm not calling—

MR. PARKER:  Is that what you'd like?  Do you want to step out of the room?

(continued...)

-9-

Magistrate Judge Elizabeth Cowan Wright and the undersigned have been called upon to resolve far too many discovery disputes, and time and again Judge Wright and the undersigned have had to admonish the attorneys to do such basic things as honor their word and behave civilly.  ECF No. 173 at 3; ECF No. 128 at 21.

---

[8](...continued)

     MR. TERRAZAS:  I'm not calling you names, Boris.

     MR. PARKER:  I don't understand what you're asking me.

     MR. TERRAZAS:  I'm not calling you names at all, Boris.

     MR. PARKER:  You're asking me to gamble money.  Do you want me to take my wallet out right now?  What are you talking about?

     MR. TERRAZAS:  No, I'm asking you—

     MR. PARKER:  Are you stable, sir?

     MR. TERRAZAS:  I'm asking—listen.  Listen, please, sir.  So are you—

     MR. PARKER: Are you threatening me?

     MR. TERRAZAS:  Are you questioning my mental capacity?

     MR. PARKER:  Yes.

     MR. TERRAZAS:  Okay.

Pl.'s Ex. E at 164-66.

As noted, both sides have now moved for summary judgment.[9]  The attorneys'
scattershot and contentious approach to discovery—and their inability to agree on
anything meaningful—has left the Court with numerous claims, numerous defenses,
and a patchwork record.  The Court will do its best to pick through the rubble and rule
on the motions.

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution
might affect the outcome of the suit under the governing substantive law.  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if
"the evidence is such that a reasonable jury could return a verdict for the nonmoving
party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable
inferences are to be drawn in [its] favor."  *Id.* at 255 (citation omitted).

---

[9]Salpeter has also filed a motion for sanctions under Fed. R. Civ. P. 11.  ECF
No. 228.  ARPwave has made some frivolous arguments, but so has Salpeter, and the
Court has determined that neither party should be sanctioned under Rule 11.
Salpeter's motion is therefore denied.

Summary judgment will be entered against the non-movant if it "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (citation omitted).

## B. *Misappropriation of Trade Secrets*

ARPwave first alleges that Salpeter misappropriated numerous trade secrets. A "trade secret" is any "information, including a . . . program, device, method, technique, or process that" (1) "derives independent economic value . . . from not being generally known" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5. For a defendant to have "misappropriated" a trade secret, the defendant must have acted wrongfully—for example, acquiring the trade secret "by improper means" or disclosing a trade secret when under "a duty to maintain its secrecy or limit its use." *See* Minn. Stat. § 325C.01, subd. 3. "Without a proven trade secret there can be no action for misappropriation, even if defendants' actions were wrongful." *Electro-Craft Corp. v.*

-12-

*Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983).  A plaintiff must allege its trade secrets "with sufficient specificity" to state a viable misappropriation claim.  1 R. Milgrim, Milgrim on Trade Secrets, § 1.01[3], at 1-240.32 (2016) [hereinafter "Milgrim"]; *see also Electro-Craft Corp.*, 332 N.W.2d at 898 (finding "lack of specificity" fatal to a trade-secret claim).

ARPwave accuses Salpeter of misappropriating countless trade secrets, which ARPwave categorizes as follows:  (1) ARPwave's devices, (2) its protocols, (3) its user manuals, (4) its "[c]ontracts and similar business-related documentation," (5) unspecified "confidential information" that Salpeter "obtained from in person and online seminars, webinars, and/or training sessions," and (6) its "[m]arketing terminology."  *See* Defs.' Ex. O.  The Court will address these categories in turn.

### 1.  Devices

ARPwave alleges that Salpeter misappropriated various trade secrets related to its electro-stimulation devices, including (1) all of the interior components of the devices (including the software), (2) the waveform produced by the devices, and (3) the exterior displays and controls of the devices.  *Id.* at 2–16.[10]  As a practical matter, then, ARPwave

---

[10]The Court cites this document's internal pagination.

is alleging that each and every one of the components of each and every one of its devices is a trade secret.

That cannot possibly be true. Each device is patented (and patents are publicly available), each device has certain features that are readily observable (including to clients who are under no duty of confidentiality), and each device has certain features that have no independent economic value. Because some components of the device are not secret—and others have no value—the entirety of every ARPwave device is clearly not a trade secret. *See, e.g., IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–67 (9th Cir. 1998).[11] ARPwave's argument to the contrary is frivolous.

For ARPwave to establish that it has a viable misappropriation claim, ARPwave must identify precisely *which parts* of its devices are trade secrets and then provide evidence that Salpeter misappropriated *those parts*. A component of a device that is reasonably discernable from a patent covering the device is not a trade secret; anyone

---

[11]Because Minnesota has adopted the Uniform Trade Secrets Act ("UTSA"), the Court looks to persuasive authority from other UTSA jurisdictions. *See, e.g., Hagen v. Burmeister & Assocs., Inc.*, 633 N.W.2d 497, 503 (Minn. 2001) (looking to trade-secret cases from other UTSA jurisdictions); *Electro-Craft Corp.*, 332 N.W.2d at 899 (same); *Jostens, Inc. v. Nat'l Comput. Sys. Inc.*, 318 N.W.2d 691, 699–700 (Minn. 1982) (same).

with an internet connection can read the patent and learn that the device includes that component. There may be components of a device that are not readily discernable to a person of skill in the relevant art who studies the relevant patent. But ARPwave never identifies any such component.

ARPwave contends that the Court can identify which components of ARPwave's patented devices are trade secrets by reviewing the expert report produced by Clear Blue Engineering. But that report is unhelpful for several reasons:

To begin with, the author of the report never inspected a Neubie. ECF No. 202-2 at 3, 15.[12] ARPwave's attorneys spent a considerable amount of time generating claims and fighting with Salpeter's attorneys, but unfortunately for ARPwave its attorneys did not pay "terribly close[]" attention to court-ordered deadlines. ECF No. 190 at 4. As a result, ARPwave failed to acquire or inspect a Neubie—perhaps the single most important piece of evidence in this case—prior to the close of discovery. That left ARPwave's expert to rely largely on guesswork, such as trying to infer the components and workings of the Neubie by looking at a bill of materials purchased by Salpeter. ECF No. 202-2 at 13.

---

[12]The Court cites this document's CM/ECF pagination.

ARPwave's expert claims that the bill of materials shows that the Neubie is a reverse-engineered copy of the RX 100, but he does not back that assertion with adequate explanation or evidence.  His report contains only a few pages of analysis, and it points to just two components of the RX 100 that the expert claims could not be gleaned from studying the patents: a particular Texas Instruments audio amplifier and a particular microprocessor.  *Id.* at 11–15.  The report notes that both of these parts are listed on the Neubie's bill of materials and asserts that it would be "highly unlikely" for Salpeter to have selected these components for the Neubie unless he had reverse engineered the Neubie from an ARPwave device.  *Id.*  But both of these parts are disclosed in a patent application filed by ARPwave's sister company in 2010 and published in 2011.  ECF No. 1-8 at 15.  Since the two components were publicly disclosed, they are not trade secrets, and Salpeter's decision to select them is not "highly unlikely" in the absence of reverse engineering.

The expert also notes that, as to the waveform produced by the ARPwave devices, studying the relevant patents "would not be sufficient to copy [the] waveforms to the level of detail required," because while "[t]he patent may show what the output waveform will look like . . . the generation of the[] waveforms can be accomplished in many different ways."  ECF No. 202-2 at 12–13.  But this abstract discussion of

waveforms is not sufficient.  The expert needed to explain exactly what the patents do and do not reveal about ARPwave's waveform and exactly what about the Neubie's waveform provides evidence that Salpeter misappropriated non-public information. He did not do this.

In sum, ARPwave has failed to (1) point to the features or parts of ARPwave's patented devices that would not be apparent to an individual skilled in the art who studied the patents and other public information; (2) point to evidence that these confidential features or parts derive independent economic value from not being generally known; and (3) point to evidence that Salpeter misappropriated these confidential features or parts when he designed the Neubie.  ARPwave cannot simply claim that every single one of the components of every single one of its devices is a trade secret, and then ask the Court (or the jury) to engage in the complex and highly technical exercise of separating the public chaff from non-public wheat.  *See IDX Sys. Corp.*, 285 F.3d at 583–84; *Imax Corp.*, 152 F.3d at 1164–67.[13]

---

[13]ARPwave also alleges that all of the displays and controls of its devices are trade secrets.  Defs.' Ex. O at 9–16.  Once again, ARPwave fails to be specific and identify *which* displays and controls are trade secrets.  Moreover, ARPwave fails to explain how a display or control could possibly be a trade secret when it is exposed to the public.  *See, e.g., IDX Sys. Corp.*, 285 F.3d at 584 ("[M]any of the items that appear in

(continued...)

ARPwave must lie in the bed that it has made.  The vagueness of ARP's trade-secret claims has been a problem from the outset of this litigation.  In fact, Judge Wright ordered ARPwave to be more specific in identifying its trade secrets.  *See* ECF Nos. 70, 75.  But ARPwave responded with supplemental interrogatory responses that failed to provide a more specific description of its trade secrets.  Instead, ARPwave simply added some photos of its devices and generally alleged that Salpeter misappropriated trade secrets by reverse engineering ARPwave devices starting in 2015.  *Compare* ECF No. 70 at 9–13[14], *with* Defs.' Ex. O at 2–35.

Denis Thompson—the founder and chairperson of ARPwave and its Rule 30(b)(6) designee—did not do any better at his deposition.  To the contrary, he doubled down on the nonsensical notion that "[t]he entire device [is] a trade secret"—including "[e]ach and every component of the device" and "[e]very single component on the

---

[13](...continued)

the 43–page description, such as the appearance of data-entry screens, are exceedingly hard to call trade secrets: things that any user or passer-by sees at a glance are 'readily ascertainable by proper means'. . . . [A] trade-secret claim based on readily observable material is a bust.").

[14]The Court cites this document's CM/ECF pagination.

[mother]board."  Pl.'s Ex. E at 34, 42; *see also id.* at 127, 129–30, 287–88.[15]  But he also

admitted that he "ha[d] no idea" what the components of the motherboard were.  *Id.*

at 129.  Thompson also did not seem to care that the patents disclosed certain parts of

the devices; indeed, he expressed the belief that *patents* are trade secrets, demonstrating

that he has no idea what a trade secret is.  *Id.* at 267 ("I definitely believe a patent is a

trade secret, yes."); *see also id.* at 32, 63–64.

Without doubt, there is evidence from which a jury could find that Salpeter took

ARPwave's devices and did some reverse engineering.  Pl.'s Exs. V, W, Y, Z.  But

ARPwave has so poorly litigated this case that there is no way that a jury could

determine—based on the evidence in the record—which components of the Neubie

represent misappropriated trade secrets and which components represent information

gleaned from the study of ARPwave's patents or other public information.  Salpeter is

therefore entitled to summary judgment on ARPwave's claim that he misappropriated

trade secrets related to its electro-stimulation devices.  *See NEXT Payment Sols., Inc. v.*

*CLEAResult Consulting, Inc.*, No. 1:17-cv-8829, 2020 WL 2836778, at *15 (N.D. Ill. May 31,

---

[15]ARPwave's Rule 30(b)(6) designee also was not specific when discussing
ARPwave's waveform, claiming that "[e]verything" about the waveform was a secret,
Pl.'s Ex. E at 62–63, but also acknowledging that much about the waveform was
disclosed in a patent, *id*. at 64.

2020) ("There is no question of fact for a jury if the plaintiff has not offered enough specificity to support a verdict by a reasonable jury.").

## 2.  Protocols

ARPwave next alleges that its "[t]reatment, training and loosening protocols"—that is, its "methods of performing electrotherapeutic stimulation"—constitute trade secrets.  Defs.' Ex. O at 17.  Once again, though, it is hard to pinpoint what ARPwave claims to be a trade secret.

ARPwave vacillates in the level of generality with which it defines its "protocols."  At the most general level, ARPwave appears to want to claim the entire field of electro-therapy (or neuro-therapy) as its own "protocol" and trade secret.  *See* Pl.'s Ex. E at 405–06, 408–10.  Obviously, ARPwave cannot claim electro-therapy as a trade secret; electro-therapy has been used to treat injuries and pain for thousands of years.  *See* ECF No. 13.

Slightly more specifically, ARPwave claims that its three-step electro-therapy (or neuro-therapy) process is a trade secret.  ARPwave defines this process as (1) putting the individual in neurological balance, (2) finding the hot spot (or source of the problem), and (3) treating the source of the problem.  ECF No. 277 at 37; *see also* Pl.'s

Ex. E at 394–97; ECF No. 250 at 1, 4, 7.  There are at least a couple of problems with this trade-secret claim:

First, ARPwave cannot claim trade-secret protection of such a highly abstract "protocol" containing such obvious steps.  It is hardly a secret that, to treat a problem with electro-therapy, the therapist must find and treat the problem.  *See* 1 Milgrim, § 1.09[3], at 1-520.1–1-520.2 ("[W]hen asserting methods and techniques and know-how to be trade secrets, a reasonable degree of precision and specificity is appropriate.").

Second, ARPwave has disclosed its general treatment process in a patent.  *See* ECF No. 1-7; Pl.'s Ex. E at 250–51 (discussing how the '474 patent "is basically a patent on our [neuro-therapy] process").  When ARPwave was asked which parts of the neuro-therapy process that Salpeter allegedly misappropriated were *not* disclosed in the patent, Thompson—testifying on behalf of ARPwave—said that he "[did]n't know." Pl.'s Ex. E at 254–57.  If ARPwave cannot determine if any aspect of its neuro-therapy process is confidential, then neither can a jury.

The most specific (and plausible) trade-secret claim that ARPwave makes with respect to its protocols relates to its step-by-step instructions for treating particular injuries.  *See* Pl.'s Ex. A; Pl.'s Ex. E at 134.  The problem, though, is ARPwave has not provided the Court with adequate evidence that Salpeter misappropriated any of these

-21-

protocols.  In their briefs, the parties focus on one particular protocol—a footbath

protocol designed by ARPwave to (presumably) treat foot and ankle injuries.  Pl.'s

Ex. A at 1.  Salpeter also has a footbath protocol.  Pl.'s Ex. AC at 1.  To the Court's eyes,

these protocols appear to be materially different; most notably, they call for different

pad placements and different treatment steps.  Pl.'s Ex. A at 1; Pl.'s Ex. AC at 1.

ARPwave has not provided evidence that would allow a jury to find that the differences

between the two footbath protocols are immaterial and thus that Salpeter

misappropriated an ARPwave trade secret.

ARPwave points to an expert report produced by Dr. Malcolm Conway.

Conway generally analyzes whether the ARPwave devices and protocols are

"comparable" to Salpeter's devices and protocols.  ECF No. 204-2 at 4.[16]  He states

generally that there is "substantial material overlap" between the two companies'

treatment methods, as they use "the same fundamentals."  *Id.* at 10.

But this is too high a level of generality to support a finding of misappropriation

of a trade secret.  Moreover, Conway fails to distinguish public information from non-

public information; he does not seem to realize that, for a treatment method to be a *trade*

---

[16]The Court cites this document's CM/ECF pagination.

*secret*, it must be a *secret*.  ARPwave may have highly effective protocols for treating particular injuries, but it has disclosed much about its treatment process in patents and elsewhere.  Conway never separates the public from the private, nor does he do a side-by-side comparison of a specific ARPwave treatment protocol (such as the footbath protocol) to a corresponding Salpeter treatment protocol and declare that the two protocols are materially identical.[17]

For these reasons, Salpeter is entitled to summary judgment on ARPwave's claim that he misappropriated various trade secrets related to its protocols.

---

[17]ARPwave also points to various emails as evidence of misappropriation.  These are even less probative than Conway's report.  In the emails, Salpeter (or one of his agents) will tell a new customer something like "your team has experience with ARP[wave], so there won't be a drastic learning curve."  Pl.'s Ex. AO at 5 (CM/ECF pagination); *see also* Pl.'s Ex. AB at 1 ("I know you already have a good knowledge base on this type of technology . . . ."); Pl.'s Ex. N at 2 ("[T]he Neubie . . . matche[s] all the ways we used the rx and pov.").

ARPwave alleges that these emails show that Salpeter has stolen ARPwave protocols.  They do not.  Someone who has previously treated patients using electro-therapy is *obviously* not going to have as "drastic" a "learning curve" as someone who has not.  These emails only show Salpeter explaining to former ARPwave customers that he offers a similar product capable of doing similar things; the emails do not show that Salpeter misappropriated a trade secret.

3.  Miscellaneous Other "Trade Secrets"

ARPwave's briefing focuses entirely on its trade-secret claims relating to its devices and protocols.  ARPwave does not defend any of its other trade-secret claims. ECF No. 258 at 28–33; ECF No. 266 at 7–9.  The Court therefore deems those other trade-secret claims to be abandoned.  Even if the claims had not been abandoned, the Court would dismiss them on the merits, as they suffer from fatal deficiencies.

To begin with, ARPwave's allegations are again insufficiently specific.  ARPwave asserts that Salpeter misappropriated its (1) user manuals, (2) "[c]ontracts and similar business-related documentation," (3) "confidential information obtained from in person and online seminars, webinars, and/or training sessions," and (4) "[m]arketing terminology."  Defs.' Ex. O at 16–18.  But these are "general categories of information, insufficiently specific to qualify as trade secrets."  *Luigino's, Inc. v. Peterson*, 317 F.3d 909, 912 (8th Cir. 2003) (citing *Electro-Craft Corp.*, 332 N.W.2d at 897–99).

Putting that aside, each category includes information that is not even confidential, much less a trade secret.  For example, the user manuals are now publicly available.  Defs.' Ex. P at 2.  And even before they were made publicly available, the manuals contained non-confidential information, such as a general description of the (patented) device, information about the FDA classification of the device, photos of the

-24-

exterior of the device, and addresses and phone numbers that could be used to contact ARPwave.  Defs.' Ex. P.  None of this information is a secret.[18]

It is not this Court's responsibility to dig through a hundred pages of user manuals and try to identify possible trade secrets.  If ARPwave wants to claim that a trade secret was contained within a user manual, then ARPwave has to identify it. ARPwave has failed to do so.  *See GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015 WL 94235, at *6–7 (N.D. Ill. Jan. 5, 2015) ("With respect to the information in the Business Plan in this case, GlobalTap has done nothing more than point to the entire 101–page document.  Even more broadly, Mr. Whitman testified that 'every word' in the Business plan is a GlobalTap trade secret. . . . Plaintiff's vagueness is fatal to its claim for trade secret protection of its Business Plan. . . . There may well be trade secrets within the 101–page Business Plan, but it was Plaintiff's burden to identify those secrets and it has repeatedly failed to do so.").

---

[18]Interestingly, when ARPwave's corporate representative was asked to compare its Trainer device manual to that product's predecessor's manual (Physio Dynamics' Therastim device), he noted that the manuals were "very similar" because a lot of the manual was "FDA legal mumbo-jumbo" that they "have to have . . . in there."  *See* Pl.'s Ex. E at 186–88.  "FDA legal mumbo-jumbo" is not a trade secret.

ARPwave's contracts are also publicly available, and they have been publicly available since at least 2016.  Defs.' Ex. Q.  Moreover, as ARPwave admitted, there is nothing "confidential" about its contracts.  Pl.'s Ex. E at 307.  Indeed, it is hard to imagine how a consumer contract could be confidential (and thus a trade secret).  ARPwave hands the contracts to prospective customers for them to review and sign before those customers are bound by any confidentiality obligations within the contracts.  Because ARPwave's contracts are not confidential, they are not trade secrets.

ARPwave's allegation that Salpeter misappropriated "confidential information obtained from in person and online seminars, webinars, and/or training sessions" is obviously insufficiently specific.  This is yet another example of ARPwave simply throwing out a claim and doing nothing with it.  The Court has no idea what trade secrets ARPwave alleges were disclosed at various seminars attended by Salpeter and later misappropriated by him.  ARPwave testified that "the information that [Salpeter] took" from these meetings was ARPwave's "protocols, period."  *Id.* at 313.  The Court has already discussed (and dismissed) ARPwave's trade-secret claims regarding its protocols.

Finally, ARPwave's allegation that its "[m]arketing terminology"—specifically its "buzzwords" such as "[n]euro reset"—is a trade secret is frivolous.  *Id.* at 313–14.

-26-

Marketing terms are used to *market* products; they do not do much good unless they are made public.  For example, ARPwave's website advertises its "Neuro Reset" process.  ECF No. 80-4 at 10.  A term that ARPwave uses in marketing its products and services *to the public*—such as "Neuro Reset"—is clearly not a trade secret.[19]

In sum, ARPwave has made numerous trade-secret claims.  But to succeed on one of those claims, ARPwave has to point to a *specific* item of "information" or a *specific* "program, device, method, technique, or process" that is not "generally known," that "derives independent economic value . . . from not being generally known," and that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Minn. Stat. § 325C.01, subd. 5.  And then ARPwave has to show that Salpeter misappropriated that specific trade secret.  Based on the evidence before the Court, ARPwave cannot make such a showing with respect to any of its trade-secret claims.

─────────────────

[19]Despite ARPwave's Rule 30(b)(6) deponent testifying that its misappropriation claim was based on Salpeter's use of particular marketing buzzwords, ARPwave's attorneys switched course at the hearing and argued that "marketing terminology" instead meant internal marketing processes and strategy.  ECF No. 277 at 53–54.  But ARPwave has not identified any specific marketing processes or strategies, provided any evidence that they are secret, or provided any evidence that Salpeter misappropriated them.  Accordingly, even if this claim were properly before the Court, it would fail.

The Court therefore grants Salpeter's motion for summary judgment on all of those claims.

### C.  Breaches of Contracts

ARPwave next asserts a long series of breach-of-contract claims against Salpeter alleging various breaches of the 2008, 2010, and 2012 agreements.  To prevail on its claims, ARPwave must establish (1) formation of a contract, (2) performance by ARPwave of any conditions precedent to its right to demand performance by Salpeter, (3) breach of the contract by Salpeter, and (4) damages.  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011); *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578–79 (Minn. Ct. App. 2004).  The applicable statute of limitations is six years.  Minn. Stat. § 541.05, subd. 1(1).  Minnesota law determines when an action is commenced for purposes of a Minnesota statute of limitations, and, under Minnesota law, an action is commenced when it is served, not when it is filed.  *See Walker v. Thielen Motors, Inc.*, 916 F.2d 450, 450–51 (8th Cir. 1990).  ARPwave served this action on July 25, 2018, ECF No. 7, and thus any claim that accrued before July 25, 2012 is time-barred.

### 1.  2008 Contract: Trainers and ARPwave Clinic

ARPwave first asserts that Salpeter breached the 2008 contract in various ways, including by failing to return the leased devices, assigning and lending the devices to

-28-

third parties, experimenting with and enhancing the devices and protocols, and

breaching confidentiality obligations.  On first glance, these claims would appear to be

barred by the statute of limitations, as the 2008 contract was a one-year lease that

expired in 2009—and Salpeter stopped making the payments required by the lease in

2010—yet ARPwave did not sue for breach of that lease until 2018.  But ARPwave

argues that the statute of limitations does not bar its claims for a couple of reasons:

First, ARPwave argues that a lease is "not a normal contract" that "terminate[s]

on its own"; instead, says ARPwave, a lease simply "converts to another type of

tenancy."  ECF No. 277 at 91.  It is true that if, for example, a tenant remains in an

apartment and continues to pay rent after her lease expires—and her landlord continues

to accept the rent payments and permits the tenant to remain in the apartment—then

the tenant may become a "holdover" and establish some type of "tenancy."  *Thompson v.

Baxter*, 119 N.W. 797, 797–98 (Minn. 1909); *see also Coinmach Corp. v. Aspenwood

Apartment Corp.*, 417 S.W.3d 909, 915–16 (Tex. 2013).  Translated into contract language,

if the conduct of both parties upon expiration of a lease manifests an intent to continue

with the lease, a new lease may be implied.

Here, however, Salpeter manifested no such intent to continue under the 2008

lease.  Unlike a tenant who continues to pay rent for an apartment after her lease

-29-

expires, Salpeter completely stopped making payments on the Trainers in

September 2010 and unambiguously breached the lease by thereafter retaining

possession of the Trainers.  At that point, ARPwave needed to enforce its

rights—demanding either that Salpeter make additional lease payments or that he

return the Trainers.  *See Park Nicollet Clinic*, 808 N.W.2d at 832–33.

ARPwave did neither.  Instead, ARPwave slept on its rights by allowing Salpeter

to keep the Trainers for eight years without making a single payment.  ARPwave cannot

now claim that its decision to say nothing about Salpeter's breach was simply its

"consent" to some type of implied contract.  This would "'make a mockery of [the]

statute[] of limitations by the simple expedient of creative labeling.'"  *Erickson v. Abby*

*Sci., Inc.*, No. A17-0661, 2018 WL 256732, at *6 (Minn. Ct. App. Jan. 2, 2018) (quoting

*Weavewood, Inc. v. S & P Home Investments, LLC*, 821 N.W.2d 576, 580 (Minn. 2012)).  On

these facts, the Court rejects ARPwave's argument, and finds that its breach-of-contract

claim related to Salpeter's failure to return ARPwave's trainers in September 2010 is

barred by the statute of limitations.[20]

---

[20]ARPwave also alleges that Salpeter breached the lease by assigning or loaning
the Trainers to third parties without ARPwave's permission.  To the extent that
ARPwave alleges that Salpeter did these things prior to September 2010, ARPwave's

(continued...)

Second, ARPwave argues that some of Salpeter's obligations under the 2008 lease survived the termination of that lease and were breached by Salpeter after July 25, 2012, and thus ARPwave's claims regarding those breaches are not barred by the statute of limitations.  *See, e.g.*, ECF No. 258 at 21–22, 25.  In particular, ARPwave points to provisions of the 2008 lease that address (1) experimenting with ARPwave's devices and protocols, (2) enhancing ARPwave's devices and protocols, and (3) confidentiality obligations.  Salpeter denies that he breached these provisions, but he does not deny that they survived the termination of the lease, nor does he argue that ARPwave's claims are barred by the statute of limitations.  The Court therefore addresses the merits of ARPwave's claims.

---

[20](...continued)
claims are barred by the statute of limitations.  To the extent that ARPwave alleges that Salpeter did these things after September 2010, the Court notes that, by that point, the relationship between the parties was no longer governed by the 2008 lease, except insofar as a survival clause extended a party's obligations past the lease's termination.  No survival clause applied to the assignment and lending provisions (which makes sense, as Salpeter was obligated to return the Trainers to ARPwave when the lease expired).  Therefore, Salpeter could not have breached the assignment and lending provisions after September 2010.  *See, e.g., Coinmach Corp.*, 417 S.W.3d at 917 (explaining that a tenant at sufferance with "no express or implied contract or agreement . . . cannot be liable for breaching a contract that did not exist").

*a. Experimenting With Protocols*

ARPwave alleges that Salpeter breached the 2008 contract by experimenting with ARPwave's protocols.  In response, Salpeter argues that ARPwave did not adequately plead (or otherwise provide notice of) this claim.  The Court agrees with Salpeter.

This claim does not appear in ARPwave's complaint.  In fact, the word "experiment" appears in the complaint only in connection with allegations regarding the experiments in which *ARPwave* engaged when it created its protocols.  ECF No. 1 ¶¶ 17, 18, 21, 23.  The complaint says nothing about *Salpeter* experimenting, much less accuse him of experimenting in breach of the 2008 lease.  ECF No. 1.

ARPWave did not otherwise give Salpeter fair notice that it was pursuing this claim.  ARPWave argues that, when Thompson testified as ARPwave's Rule 30(b)(6) designee, he gave Salpeter notice of this claim.  ECF No. 274 at 2, ¶ 3 (citing Pl.'s Ex. E at 373–74).  The testimony to which ARPwave refers was as follows:

> Q:    What did [Salpeter]—what did he violate or not
>       follow?
>
> A:    Well, we've already discussed that.  I don't know if he
>       paid, and if he didn't pay, that's a violation.  And if he
>       didn't give me a written notice of continuation, that's
>       a violation.  And if he didn't give me written notice of
>       termination, that's a violation.  And if he decided on
>       his own to do anything outside of our protocols, that's

> a violation.  If he decided to sell equipment, that's a
> violation.  So, yeah, there's violations.

Pl. Ex. E at 373–74.

This list of hypothetical contract violations—which does not specifically mention experimenting with protocols—did not provide fair notice to Salpeter that ARPwave was asserting a claim that he breached the 2008 lease by experimenting with its protocols.  *See Richardson v. Omaha Sch. Dist.*, 957 F3d 869, 877–78 (8th Cir. 2020); *S & A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 952–53 (8th Cir. 2012).  Indeed, ARPwave has never asserted a claim with respect to most of the items that *were* on Thompson's list, such as failing to give written notice of continuation or termination.

Because ARPwave did not plead or otherwise alert Salpeter that it was claiming that he breached the 2008 contract by experimenting with ARPwave's protocols, the Court dismisses this claim.

### b. Enhancing Devices and Protocols

ARPwave next alleges that Salpeter enhanced ARPwave's devices and protocols, and that—under the contract—ARPwave now owns those enhancements.  ECF No. 258 at 22–24.  Salpeter responds in two ways:

First, Salpeter again argues that this claim was not pleaded in ARPwave's complaint and that he did not otherwise receive fair notice of it.  ECF No. 260 at 11–12. That is clearly not true.  In September 2019, Salpeter moved the Court for leave to amend his answer and add a counterclaim after he "learned for the first time" that ARPwave was "asserting that any protocols developed by Mr. Salpeter while he simply owned an ARPwave device are alleged to be the property of ARPwave . . . ."  ECF No. 53 at 2.  Obviously, then, Salpeter knew by September 2019 that ARPwave was claiming that it owned any "improvements" or "enhancements" that he made to the protocols.  Salpeter was given leave to amend.  He added a counterclaim in response to ARPwave's allegation, and he was able to conduct discovery regarding the allegation. He had fair notice of ARPwave's claim.

Second, Salpeter argues that ARPwave has not shown that the device and protocols that he developed are, in fact, enhancements or improvements of ARPwave devices or protocols.  The Court agrees.

*As to the devices:*  The parties' contract provides that "[t]he equipment [i.e., the Trainers] shall at all times be and remain, the sole and exclusive property of [ARPwave]" and Salpeter shall not, without prior written consent from ARPwave, "make any alterations, changes, additions or improvements *to the equipment*."  ECF

-34-

No. 1-1 at 3, ¶ 6 (emphasis added).  If alterations are made, then "[a]ll additions and improvements of whatsoever kind or nature made *to the equipment* shall belong to and become the property of [ARPwave] upon the expiration or earlier termination of this lease."  *Id.* (emphasis added).

The problem for ARPwave is that Salpeter did not make any alterations, changes, additions, or improvements *to the equipment*—i.e., to the Trainers that ARPwave owned and Salpeter leased.  Instead, Salpeter designed and manufactured a *new* electro-stimulation device—a device that ARPwave did not own and that Salpeter did not lease.  The device-enhancement provision simply does not cover Salpeter's new device.[21]

The purpose of this provision is clear.  Because ARPwave remains the "sole and exclusive" owner of the Trainers, and because Salpeter is required to return the Trainers to ARPwave upon expiration or termination of the lease, any changes that Salpeter makes to the Trainers become ARPwave's property.  The situation is akin to a customer renting a car from Hertz, installing new speakers to improve the sound system, and

---

[21]The Court also notes that this particular device-enhancement provision is found in the equipment-lease section of the contract, and not the license-agreement section. As a result, no survival clause appears to apply to the provision, and that would seem to be fatal to ARPwave's claim.  For some reason, though, Salpeter did not make this argument, and thus the Court does not rely on it.

later returning the car to Hertz.  Hertz would continue to own the car, including the new speakers.

The "enhancement" provision of the 2008 lease cannot be read as giving ARPwave ownership rights over any new electro-stimulation device that Salpeter builds simply because he leased an ARPwave device.  If Salpeter infringed a patent or misappropriated a trade secret in designing his new device, ARPwave could pursue legal remedies.  But ARPwave cannot claim ownership over any device built by Salpeter by arguing that such a device must necessarily be an "improvement" of the Trainers.

*As to the protocols:*  The 2008 lease provides that Salpeter "shall not make enhancements or modify, or alter the System(s)" that ARPwave licensed to him without its "express written consent."  ECF No. 1-1 at 7, § 2, ¶ 4.  The contract defines the "System(s)" as including all of ARPwave's "proprietary training protocols and programs" and related intellectual property.  *Id.* at 6, § 1, ¶ 1.  If Salpeter makes any "enhancements" to the "System(s)," those enhancements "remain the sole and absolutely [sic] property of [ARPwave]."  *Id.* at 7, § 2, ¶ 4.  Notably, the contract speaks

in terms of property "remain[ing]" ARPwave's, not of property "becoming"

ARPWave's property through assignment or otherwise.[22]

To succeed on this claim, ARPwave must identify a specific protocol that it owns,

describe the "enhancement" that Salpeter made to that protocol, and explain why the

enhanced protocol "remains" ARPwave's. ARPwave never does so. Instead, ARPwave

generally alleges that Salpeter's entire treatment method is a rip-off of its entire

treatment method. But ARPwave cannot claim the entire field of electro-therapy as its

own. Nor can ARPwave convert this enhancement clause into (1) an assignment clause

that assigns all Salpeter's ideas regarding electro-therapy to ARPwave or (2) a non-

compete clause that forbids Salpeter from operating his own electro-therapy clinic.

Salpeter is entitled to summary judgment on this claim.

### c. Confidentiality

Finally, ARPwave alleges that Salpeter breached the confidentiality provision of

the 2008 contract, which forbids Salpeter from making available "the System(s) to any

other party without the written consent of [ARPwave]." ECF No. 1-1 at 8, § 4, ¶ 5.

---

[22]This is in contrast to the provision governing modifications to the devices, which makes clear that modifications to ARPwave's devices shall "become" ARPwave's property. ECF No. 1-1 at 3, ¶ 6

Once again, the contract defines the "System(s)" as, essentially, all of ARPwave's "protocols" and "related intellectual property."  *Id.* at 6, § 1, ¶ 1.

ARPwave's briefing makes some bold allegations—for example, that Salpeter disclosed confidential information related to its "protocols and methods" to over 500 individuals.  ECF No. 258 at 24–25.  But in support of these allegations ARPwave cites only a single piece of evidence: the expert report that Salpeter himself wrote.  *See id*. at 24 (citing ECF No. 203-2 at 3–4).  Salpeter's report describes how he trained over 500 individuals on how to use the NeuFit system.  ECF No. 203-2 at 4.[23]  Critically, however, that same report says that the NeuFit system is *not* based on any ARPwave protocols, methodology, or technology.  *Id.* at 3.  Thus, the only evidence cited by ARPwave in support of its claim that Salpeter disclosed confidential information *about the ARPwave system* is an expert report stating that Salpeter trained individuals on how to use a system that is *not based on the ARPwave system*.  Accordingly, Salpeter is entitled to summary judgment on ARPwave's claim that he breached the confidentiality provision.  *See Binion v. City of St. Paul*, 788 F. Supp. 2d 935, 950 (D. Minn. 2011) ("This Court does not function as a research assistant for the parties.  If [the plaintiff] is serious about [its] . . . claim, then it is [the plaintiff's] responsibility to brief it—and, in

_____

[23]The Court cites to this document's CM/ECF pagination.

particular, to cite evidence in the record supporting it." (citations omitted)); *see also*

*Crossley v. Ga-Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004) ("'Rule 56 does not impose

upon the district court a duty to sift through the record in search of evidence to support

a party's opposition to summary judgment.'" (quoting *Ragas v. Tenn. Gas Pipeline Co.*,

136 F.3d 455, 458 (5th Cir. 1998))).[24]

### 2. 2010 and 2012 Contracts: RX 100 and POV Sport

ARPwave also asserts a long list of breach-of-contract claims related to its 2010

and 2012 contracts with Salpeter.  As noted above, the 2010 contract was a five-year

lease for an RX 100 device and the 2012 contract was a five-year lease for a POV Sport

device.  ARPwave's claims for breaches of these contracts relate to Salpeter allegedly

(1) failing to return the devices, (2) selling or assigning the devices, (3) lending the

---

[24]The Court notes that, once again, ARPwave has failed to be specific about what, exactly, it claims was "confidential."  As it did with respect to its trade-secret claims, ARPwave throws around the words "protocol" and "system," but uses those words at varying levels of abstraction.  It is true that ARPwave can protect as "confidential" something that is not a "trade secret."  *See, e.g.*, *Orthofix, Inc. v. Hunter*, 630 F. App'x 566, 567–68 (6th Cir. 2015) (explaining "the relationship of three separate categories of business information: (1) 'trade secrets,' (2) contractually protected 'confidential information,' and (3) 'general skills and knowledge'").  But ARPwave cannot protect as "confidential" something that is publicly available—such as information that can be gleaned from reviewing a patent or that a passerby can learn simply by glancing at an ARPwave device.  This lack of specificity provides an independent basis for dismissing ARPwave's claim that Salpeter breached the confidentiality clause.

devices to third parties, (4) experimenting with the devices and protocols, (5) enhancing the devices and protocols, and (6) breaching the confidentiality provisions.

### a. Failing To Return Devices

Like the 2008 contract, the 2010 and 2012 contracts require Salpeter to return the leased devices to ARPwave upon expiration or termination of the leases. ECF No. 1-2 at 3–4, ¶ 11; ECF No. 1-3 at 4, § 7.2. As to the 2010 contract, Salpeter argues that ARPwave got back its RX 100 from a third party. ECF No. 231 at 19. As to the 2012 contract, Salpeter argues that the agreement is ambiguous about whether he must return the POV Sport. *Id.* Both of Salpeter's arguments fail.

As to the 2010 contract: The contract clearly requires Salpeter to return the RX 100 to ARPwave by delivering or shipping it to a location specified by ARPwave. ECF No. 1-2 at 3–4, ¶ 11. Salpeter breached that obligation. The fact that a third party may have returned the RX 100 to ARPwave (which ARPwave disputes, *see* ECF No. 274 at 4) relates to the extent of ARPwave's damages, not to whether Salpeter breached.

As to the 2012 contract: Salpeter claims that the contract is ambiguous regarding whether he must return the POV Sport because the contract provides that he may maintain possession of the device "'[o]nce the original term has been met.'" ECF No. 231 at 19 (quoting ECF No. 1-3 at 3, § 1.3). The contract is not ambiguous. The

clause that Salpeter cites provides that, after the original 60-month term expires,

Salpeter may continue to possess the device if he pays the usage fees associated with it.

(He does not have to pay additional licensing fees.)  ECF No. 1-3 at 3, § 1.3.  But that

same provision also makes clear that the other terms of the contract remain in effect.  *Id.*

One of those other terms requires that "[u]pon termination of th[e] Agreement for any

reason," Salpeter must "immediately return" the device to ARPwave.  ECF No. 1-3 at 4,

§ 7.2.  ARPwave terminated the agreement in June 2018.  *See* Pl.'s Exs. Q, R.  At that

point, Salpeter was required to return the POV Sport to ARPwave.  ECF No. 1-3 at 4,

§ 7.2.  He did not do so, and hence he breached the contract.

Although the Court finds that Salpeter breached the 2010 contract by failing to

return the RX 100—and breached the 2012 contract by failing to return the

POV Sport—the Court will not grant summary judgment to ARPwave on those claims.

For one thing, the issue of damages must be tried before the Court can enter judgment.

For another, Salpeter argues that his fraud counterclaim provides a defense to the

alleged breaches of the 2010 and 2012 contracts, and, as the Court explains below, it

cannot grant ARPwave summary judgment on that counterclaim.  In short, although

ARPwave is virtually certain to prevail on these claims, the Court cannot enter judgment in its favor at this time.[25]

### b. Assigning Devices

ARPwave next alleges that Salpeter improperly sold or assigned the RX 100 and POV Sport in violation of the 2010 and 2012 contracts (respectively).  Salpeter argues that he did not receive fair notice that ARPwave was asserting this claim, either in ARPwave's complaint or in any other way.  ECF No. 260 at 11.  The Court disagrees.

First, the complaint notes that the contracts prohibit assignments, ECF No. 1 ¶¶ 40, 52, and it alleges that Salpeter sold some of the devices (the Trainers) in violation of a contract, *id.* ¶ 49.  Salpeter thus had notice that ARPwave was—at a minimum—alleging that he violated the 2008 contract by selling some of the Trainers.  The complaint goes on to express ARPwave's belief that Salpeter still possessed the RX 100 and POV Sport.  *Id.* ¶¶ 54, 58.  Salpeter knew that ARPwave's belief was

---

[25]ARPwave also brings a conversion claim against Salpeter, but it concedes that this claim is "duplicative" of its claims asserting that Salpeter breached the contracts by failing to return the devices.  ECF No. 277 at 139.  ARPwave noted at the hearing that, if the Court found that the contracts obligated Salpeter to return the devices (as it has), ARPwave does not "need a dual claim."  *Id.*  But Salpeter is alleging that his contracts with ARPwave are invalid because they were induced by fraud.  As the Court explains below, Salpeter's fraud claim is likely to be dismissed, but until it is dismissed, the Court will not dismiss ARPwave's conversion claim.

mistaken, though, as he had sold those devices. Pl.'s Ex. G at 268–72. Salpeter thus should have anticipated that, as soon as ARPwave learned that he had sold the RX 100 and the POV Sport, ARPwave would claim that he violated the anti-assignment clauses in the 2010 and 2012 contracts.

Salpeter's sale of the ARPwave devices was a recurring topic during discovery. For example, during his deposition, Salpeter was asked exactly what he did with all of the devices—including the RX 100 and the POV Sport. *See, e.g., id.; see also id.* at 138, 147–48. He was repeatedly asked if he ever received written permission to sell the devices, as the contracts require. *Id.* at 112–15, 128–31, 148. Moreover, ARPwave's Rule 30(b)(6) witness testified that Salpeter's selling of the devices was a breach of contract.[26] All of this gave Salpeter fair notice that ARPwave was claiming that his sales of the RX 100 and POV Sport breached the 2010 and 2012 contracts (respectively).

Salpeter does not assert any other defense to ARPwave's claim that he breached the 2012 agreement when he sold the POV Sport. ECF No. 260 at 15. Salpeter's only

---

[26]Pl.'s Ex. E at 353 (Q: "Mr. Thompson, Exhibit 23 shows that Mr. [Salpeter] told ARP Wave in 2017 that he had sold machines, right?" A: "Which is illegal."); *id.* at 362 (Q: "So there's no one from Manufacturing that's telling Mr. Salpeter that there's anything wrong with him selling the machine, is there? . . . A: "Don't know. You know he knows you can't do it. You got a contract that says you can't do it. He did it. Bingo-bango.").

defense with respect to the RX 100 is that he did not *sell* it, because once the person who was going to purchase it (Paul Coleman) found out that ARPwave would not allow him to "buy time" on it, he refused to pay Salpeter.  ECF No. 260 at 15 (citing Pl.'s Ex. G at 271–72).  But it is irrelevant whether money changed hands.  The 2010 contract does not bar Salpeter from "selling" the RX 100; it bars him from "assign[ing], transfer[ring], pledg[ing], or hypothecat[ing]" it.  ECF No. 1-2 at 4, ¶ 14.  Salpeter, by his own admission, assigned the RX 100 (and the POV Sport) to Coleman.

Again, the Court finds that Salpeter breached the 2010 and 2012 contracts. Again, though, the Court will not enter judgment against Salpeter at this time because of the need to determine damages and adjudicate Salpeter's fraud defense.

### c. Lending Devices

ARPwave next alleges that Salpeter loaned various ARPwave devices to (1) Nanohmics (the company that built the Neubie prototype), (2) Ki O (Salpeter's former business partner), and (3) the NeuFit LLCs (Salpeter's electro-therapy businesses).  ECF No. 258 at 16–19.  According to ARPwave, Salpeter thereby breached the third-party-use prohibition found in the contracts.  *Id.*  Salpeter alleges, once again, that he did not receive fair notice of this breach-of-contract claim.  ECF No. 260 at 11–12. The Court agrees.

-44-

Nanohmics and Ki O are not mentioned in the complaint.  ECF No. 1.  The NeuFit LLCs are mentioned, but only briefly, and only with respect to ARPwave's trade-secrets and patent-infringement claims.  *Id.*  ARPwave argues that two large block quotations in the complaint gave notice of its "lending" claim to Salpeter.  ECF No. 274 at 2, ¶ 2 (citing ECF No. 1 ¶¶ 40, 57).  The Court disagrees.  The first block quote is of the entire assignment clause; this block quote most clearly applies to ARPwave's *assignment* claims.  The second block quote is about various confidentiality requirements; this block quote most clearly applies to ARPwave's *confidentiality* claims. A reasonable defendant who read these block quotes would not understand them to be asserting a *lending* claim, particularly when the complaint does not contain a single factual allegation about lending.

Because ARPwave failed to give fair notice of its lending claim to Salpeter, the Court dismisses it.  *See Richardson*, 957 F.3d at 877–78; *S & A Farms, Inc.*, 678 F.3d at 952–53.

### d.  Experimentation, Enhancement, and Confidentiality

The parties make the same arguments with respect to the experimentation, enhancement, and confidentiality clauses of the 2010 and 2012 contracts as they do with respect to the corresponding clauses of the 2008 contract.  The Court's analysis of the

2008 claims thus applies fully to the 2010 and 2012 claims.  Accordingly, the experimentation claim is dismissed, as ARPwave did not adequately plead it.  Salpeter is granted summary judgment on the enhancement claim, as ARPwave has not provided evidence that Salpeter's device or protocols are "enhancements" or "improvements" of ARPwave's devices and protocols.  And Salpeter is granted summary judgment on ARPwave's confidentiality claim, as ARPwave has not pointed to any specific, non-public, confidential information that Salpeter disclosed.[27]

### D. Unfair Competition

Finally, ARPwave brings two unfair-competition claims, one alleging tortious interference with prospective economic advantage and the other alleging wrongful interference with contract.  ARPwave appears to use the same allegations in support of both claims, arguing essentially that Salpeter interfered with ARPwave's business by

_____

[27]ARPwave also brings an unjust-enrichment claim against Salpeter.  "The doctrine of unjust enrichment allows a court to imply a contract when a defendant would otherwise improperly retain a benefit bestowed by the plaintiff."  *Rapp v. Green Tree Servicing, LLC*, No. 12-CV-2496 (PJS/FLN), 2013 WL 3992442, at *8 (D. Minn. Aug. 5, 2013).  But "[a] plaintiff cannot recover for unjust enrichment 'when there is an enforceable contract that is applicable.'"  *Moreno v. Wells Fargo Bank, N.A.*, No. 18-CV-2760 (PJS/DTS), 2019 WL 1438248, at *7 (D. Minn. Apr. 1, 2019) (quoting *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012)).  Because Salpeter is arguing that his contracts with ARPwave are not enforceable because they were induced by fraud, the Court will not dismiss ARPwave's unjust-enrichment claim at this time.

"diverting" its licensees to NeuFit "and by specifically targeting medical professionals, therapists, and consumers familiar with the ARPwave Systems."  ECF No. 258 at 34.

### 1.  Tortious Interference With Prospective Economic Advantage

To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must establish five elements:

(1)     The existence of a reasonable expectation of economic advantage;

(2)     Defendant's knowledge of that expectation of economic advantage;

(3)     That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;

(4)     That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized [its] economic advantage or benefit; and

(5)     That plaintiff sustained damages.

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

ARPwave's claim suffers from a couple of problems.  For starters, ARPwave has pointed to no evidence establishing that Salpeter intentionally interfered with ARPwave's prospective economic advantage in a manner that was "independently

-47-

tortious or unlawful." *Id.* at 218.  Indeed, the Court is not even certain what

"independent[] tort[]" or "violation of a state or federal statute" ARPwave is claiming.

*Id.* at 219.

ARPwave supports its tortious-interference claim with a single paragraph

arguing that Salpeter has interfered with its prospective business relations "by way of

unfair advantage and unfair competition."  ECF No. 258 at 34.  But "[u]nfair

competition is not a tort with specific elements; it describes a general category of torts

which courts recognize for the protection of commercial interests."  *Rehab. Specialists,*

*Inc. v. Koering*, 404 N.W.2d 301, 305 (Minn. Ct. App. 1987).  A plaintiff cannot recover on

a claim for "unfair competition" because there is no such cause of action; after all,

"unfair competition" has no elements, and thus it would be impossible for a judge to

instruct a jury and impossible for a jury to return a verdict on a claim of "unfair

competition."  Instead, the phrase "unfair competition"—like the phrase "personal-

injury actions" or "intentional torts"—describes a *category* of torts.  To determine if a

plaintiff can recover, a court must identify a tort within the category and examine the

elements of that tort.

Obviously, then, ARPwave cannot claim "unfair advantage" or "unfair

competition" as the underlying tort.  ARPwave has not otherwise attempted to identify

-48-

a tort or statutory or regulatory violation that Salpeter committed when he allegedly interfered with ARPwave's reasonable expectation of economic advantage. *See Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) ("[I]mproper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law." (citation omitted)). This is fatal to its claim.

In addition, the tort of tortious interference with prospective economic advantage is committed when a defendant interferes with a non-contractual relationship—generally by unlawfully preventing an anticipated contract from being *formed*—while the tort of wrongful interference with a contract is committed when a defendant causes a breach of an *existing* contract. *See Gieseke*, 844 N.W.2d at 216–19. ARPwave has not pointed to any *non-contractual* relationship with which Salpeter allegedly interfered; instead, ARPwave complains about Salpeter interfering in *contractual* relationships between ARPwave and its clients.

The Court therefore grants Salpeter's motion for summary judgment on ARPwave's claim of tortious interference with prospective economic advantage, and turns to ARPwave's claim of wrongful interference with contract.

## 2. Wrongful Interference With Contract

To prevail on a claim for wrongful interference with an existing contract, a plaintiff must establish (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a breach of the contract; (4) that the defendant acted without justification; and (5) that the plaintiff sustained damages. *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982).

ARPwave alleges that Salpeter's conduct caused ARPwave's licensees to breach their contracts in two ways: (1) the licensees no longer licensed ARPwave equipment and protocols and (2) the licensees breached confidentiality provisions in their contracts. ECF No. 258 at 34–36; ECF No. 277 at 140–46.

To the extent that ARPwave broadly argues that it was unlawful for Salpeter to poach any of ARPwave's clients, ARPwave's claim fails. ARPwave's customers have every right to stop doing business with ARPwave and start doing business with Salpeter. Nothing in ARPwave's licensing agreement prohibits customers from leaving. *See United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1982). Thus, on that broad claim, ARPwave cannot show a breach of any contract, and thus cannot recover for wrongful interference with a contract.

-50-

There is, however, a narrower claim on which ARPwave could prevail. Although ARPwave's clients are free to move their business from ARPwave to Salpeter, they are required to provide ARPwave with 30 days' notice. Pl.'s Ex. AH at 3. Based on the record before the Court, a jury could find that one of ARPwave's clients—Dr. Drew Durbin—failed to provide 30 days' notice in breach of his contract, and that this breach was procured without justification by Salpeter.

The circumstances under which Dr. Durbin left ARPwave and joined NeuFit are contested. Salpeter alleges that Dr. Durbin left ARPwave in September 2018 and did not become a NeuFit customer until the spring of 2019; thus, says Salpeter, there was no contractual interference. ECF No. 260 at 9; Pl.'s Ex. AG at 53, 63, 66–67. But emails from the spring of 2019 suggest that Dr. Durbin signed a contract with NeuFit while simultaneously "hav[ing] an ARPWave therapist in [his] office." Pl.'s Ex. AO at 15. In fact, the emails imply that Dr. Durbin put off inspecting the Neubie that had been supplied to him until the weekend because he wanted to hide it from the ARPwave therapist that still worked in his office. *Id.* Drawing all inferences in ARPwave's favor (as the Court must), a jury could find that (1) Dr. Durbin was still an ARPwave client in the spring of 2019 and (2) Dr. Durbin effectively terminated his contract with ARPwave

without giving the required notice.[28]  The Court therefore concludes that factual

disputes preclude summary judgment on the (exceedingly narrow) claim that Salpeter

caused Dr. Durbin to breach the 30-day notice provision of his contract with ARPwave.

The Court will, however, grant summary judgment to Salpeter on ARPwave's

claim that he caused former ARPwave licensees to breach the confidentiality provisions

of their contracts with ARPwave.  ARPwave has cited no evidence that any former

licensee unlawfully used its confidential information, much less that a former licensee

was induced by Salpeter to unlawfully use ARPwave's confidential information.  The

primary evidence that ARPwave cites in support of this claim is emails from Salpeter to

former licensees saying things such as "your team has experience with ARP[wave], so

there won't be a drastic learning curve."  Pl.'s Ex. AO at 5.  But this is not evidence that

Salpeter is inducing former ARPwave licensees to breach the confidentiality provisions

of their contracts with ARPwave.  As the Court already explained, someone who has

previously provided neuro-therapy will *of course* have a less drastic learning curve than

---

[28]Dr. Durbin himself never claimed that he provided ARPwave with 30 days'
notice; instead, he claimed that he called ARPwave in September 2018 to say that he
was "done with ARPwave effective as of the conversation."  Pl.'s Ex. AG at 53; *see also
id.* at 59.  As the Court noted, a jury could find that Dr. Durbin was mistaken in
testifying that he ended his relationship with ARPwave in September 2018.  *See* Pl.'s
Ex. AO at 15.

someone who has not.  This email provides no evidence that any former ARPwave

clients breached the confidentiality provisions of their contracts with ARPwave.[29]

Accordingly, the Court grants summary judgment to Salpeter on this aspect of

ARPwave's claim for wrongful interference with an existing contract.

### E.  Fraud Counterclaim

Salpeter brings a counterclaim against ARPwave for fraud.  He alleges that,

before he signed the 2008 contract, ARPwave provided certain oral assurances that

induced him to sign that contract, as well as to sign the 2010 and 2012 contracts.  ECF

No. 138 at 21–25.  Specifically, Salpeter claims that ARPwave promised that it would

provide access to any ARPwave protocols that he needed to operate his clinic and that it

would refer clients to him, but that ARPwave did not fulfill either of those promises.

Pl.'s Ex. G at 124, 248–49, 254–55.

There are at least a couple of significant problems with Salpeter's counterclaim:

First, to recover on his counterclaim, Salpeter must show not merely that

ARPwave did not keep its promises, but that ARPwave "had no intention to perform at

---

[29]As an aside, the Court notes that the fact that there will *be* a learning curve for former ARPwave licensees is evidence that there are differences between, on the one hand, Salpeter's device and protocols and, on the other hand, ARPwave's devices and protocols.  If there were no material differences, there would be no learning curve.

the time the promise was made." *Vandeputte v. Soderholm*, 216 N.W.2d 144, 147 (Minn. 1974).  Salpeter has not cited any evidence that *at the time ARPwave made these promises*, it did not intend to fulfill them.

Second, Salpeter's counterclaim seems to be barred by the statute of limitations. In Minnesota, fraud claims are subject to a six-year statute of limitations, which "begins to run 'when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered.'"  *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted; emphasis added); Minn Stat. § 541.05, subd. 1(6). Salpeter served his counterclaim on March 10, 2020.  ECF No. 138.  Thus, if he discovered or *should have discovered* ARPwave's fraud prior to March 10, 2014, his counterclaim is barred.

Again, Salpeter alleges that ARPwave committed fraud when it promised to give him access to protocols and refer clients to him.  These promises were allegedly made in *2008*.  It is almost inconceivable that *six years later* Salpeter did not realize—nor reasonably should have realized—that ARPwave never intended to honor its promises.[30]

---

[30]Salpeter *pleads* that he did not discover that ARPwave's promises were lies until 2013 or 2014.  *See* ECF No. 109 at 18–19.  But Salpeter never *testified* to that.  *See* Pl.'s

(continued...)

These problems with Salpeter's counterclaim seem obvious, but ARPwave's motion for summary judgment inexplicably fails to rely on either of them. Instead, ARPwave argues that (1) promises to act in the future can never serve as the basis for a fraud claim; (2) Salpeter's fraud claim is barred by the parol-evidence rule; and (3) Salpeter's fraud claim is waived under the contract. ECF No. 258 at 37–40. All of these arguments are meritless.

First, Minnesota law is crystal clear that promises to perform actions in the future can serve as the basis for a fraud claim if "the promisor had no intention to perform at the time the promise was made." *Vandeputte*, 216 N.W.2d at 147. Judge Wright explained as much to ARPwave when she granted Salpeter leave to add his counterclaim. ECF No. 109 at 10–13.[31]

_____

[30](...continued)
Ex. G at 255 (testifying that he realized he was not getting referrals and that ARPwave was selling directly to Austin residents "[s]ometime between 2009 and 2016"); *see also* Pl's. Ex. H at 42 (explaining that ARPwave promised "to teach [him] something . . . call[ed] in-balance" but it never did so and he "had to go separately to pay another doctor for education in . . . in-balance" in, he "believe[s] . . . 2009"). Salpeter has never provided an explanation—believable or otherwise—for why he did not realize before March 2014 that ARPwave did not intend to fulfill its promises, but he did come to that realization after March 2014.

[31]In its reply brief, ARPwave appeared to characterize the law correctly and for the first time alluded—albeit vaguely and in a parenthetical—to what should have been
(continued...)

Second, ARPwave argues that Salpeter's claim is barred by the parol-evidence rule because (according to ARPwave) its alleged promises were contradicted by the terms of the contract.  For example, ARPwave argues that its alleged promise to provide Salpeter with all of the protocols that he needed is contradicted by the provision of the contract that lists *specific* protocols that Salpeter was entitled to receive.  ECF No. 258 at 38–39.  But simply listing a few specific protocols that Salpeter will be provided does not "directly contradict" an oral promise to provide *additional* protocols.  *See Randall v. Lady of Am. Franchise Corp.*, 532 F. Supp. 2d 1071, 1083 (D. Minn. 2007) ("In Minnesota, only when an allegedly fraudulent statement directly contradicts a substantive contract term will courts rely on the parol-evidence rule to reject a fraud claim.").

---

[31](...continued)
its primary argument:  Salpeter has no evidence that ARPwave did not intend to honor its promises at the time they were made.  *See* ECF No. 266 at 9 (stating that "[Salpeter's] counterclaim for fraud" consists of "future promises (with no evidence of any wrongful 'intent' of ARPWave prior to entering into the contracts) . . . .").  But even if ARPwave had made this argument clearly, the Court could not grant summary judgment on the basis of this argument because ARPwave made it for the first time in a reply brief.  *See, e.g., Redking Foods LLC v. Minn Assocs. LP*, No. 13-CV-0002 (PJS/JSM), 2014 WL 754686, at *4 (D. Minn. Feb. 26, 2014) ("By raising this argument for the first time in its reply brief, RedKing violated Local Rule 7.1(c)(3)(B), which provides that '[a] reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response.'  Moreover, 'federal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief.'" (citation omitted)).

ARPwave also argues that its alleged promise to "'refer all clients in the greater Austin area'" to Salpeter is "directly contradicted" by the contract, which provides that Salpeter is being granted a "'non-exclusive' license." ECF No. 258 at 38. This argument is difficult to understand. An individual can be a non-exclusive licensee and still receive referrals; for example, ARPwave could grant non-exclusive licenses to three providers in Austin, but promise only one of those three providers that ARPwave will refer clients to it.

Finally, ARPwave argues that Salpeter's fraud claim is waived under the contract. *Id.* at 39–40. ARPwave points to a provision under which Salpeter purports to waive any rights that he may have "at law and equity to claim fraud, inaccuracy, [or] imperfection *of the System(s) herein claimed* . . . ." ECF No. 1-1 at 11, § 10, ¶ 3 (emphasis added). This is another frivolous argument. "The Minnesota Supreme Court has long held that fraud cannot be waived by a contractual disclaimer." *Great Plains Educ. Found., Inc. v. Student Loan Fin. Corp.*, No. A20-0326, 2020 WL 7690269, at *3 (Minn. Ct. App. Dec. 28, 2020). Putting that aside, Salpeter is not claiming fraud or imperfection *of the ARPwave system*; he is claiming that he was fraudulently induced to enter into the leases.

-57-

The Court is left in a frustrating position.  Salpeter appears to have almost no chance of prevailing on his counterclaim.  But because ARPwave moved for summary judgment on the basis of three weak arguments—and did not move for summary judgment on the basis of two strong arguments available to it—the Court has no choice but to deny ARPwave's motion for summary judgment.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

(1)   Defendants' motion for summary judgment [ECF No. 228] is GRANTED IN PART AND DENIED IN PART as follows:

    a.   The motion is GRANTED as to all of plaintiff's claims alleging that defendants misappropriated trade secrets.  Those claims are DISMISSED WITH PREJUDICE.

    b.   The motion is GRANTED as to all of plaintiff's claims alleging that defendants breached the 2008 contract.  Those claims are DISMISSED WITH PREJUDICE, except that the claim that defendants breached the 2008 contract by experimenting with plaintiff's protocols is DISMISSED WITHOUT PREJUDICE.

  c.  The motion is DENIED as to all of plaintiff's claims alleging that defendants breached the 2010 and 2012 contracts by failing to return and by assigning the RX 100 and POV Sport devices.  The motion is GRANTED as to all of plaintiff's other claims alleging that defendants breached the 2010 and 2012 contracts and those claims are DISMISSED WITH PREJUDICE, except that the claims that defendants breached the contracts by lending the devices and experimenting with plaintiff's protocols are DISMISSED WITHOUT PREJUDICE.

  d.  The motion is GRANTED as to all of plaintiff's claims alleging tortious interference with prospective economic advantage.  Those claims are DISMISSED WITH PREJUDICE.

  e.  The motion is DENIED as to plaintiff's claim that defendants wrongfully interfered with a contract by causing Dr. Drew Durbin to breach the 30-day notice provision of his contract with ARPwave.  The motion is GRANTED as to all of plaintiff's other claims alleging wrongful interference with a contract, and those claims are DISMISSED WITH PREJUDICE.

      f.      The motion is DENIED as to plaintiff's conversion and unjust-

            enrichment claims.

(2)     Plaintiff's motion for summary judgment [ECF No. 249] is DENIED.

(3)     Defendants' motion for Rule 11 sanctions [ECF No. 228] is DENIED.

Dated: January 19, 2021             s/Patrick J. Schiltz                             
                                        Patrick J. Schiltz
                                        United States District Judge